IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

STATE V. PETTID

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JAMES R. PETTID, APPELLANT.

Filed July 7, 2026.    No. A-25-764.

Appeal from the District Court for Douglas County: DEREK R. VAUGHN, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Megan E. Jeffrey for appellant.

Michael T. Hilgers, Attorney General, and Melissa R. Vincent for appellee.

RIEDMANN, Chief Judge, and BISHOP and WELCH, Judges.

BISHOP, Judge.

### INTRODUCTION

James R. Pettid served as the chief financial officer of Medics at Home, a closely held corporation based in Omaha, Nebraska. Over the course of several years, Pettid used corporate funds to make thousands of dollars in unauthorized personal purchases. Pursuant to a plea agreement, Pettid pled no contest in the Douglas County District Court to the crime of theft by deception ($5,000 or more) and was sentenced to 60 months' probation. As a condition of probation, Pettid was ordered to pay $139,817.87 in restitution to the corporation. On appeal, he challenges the district court's order of restitution, arguing it was not sufficiently specific, was unsupported by the evidence, and failed to adequately account for his ability to pay. We affirm.

### BACKGROUND

In 2010, Pettid, Thomas Townsend, and Brian Townsend founded the "ambulance company" Medics at Home. Each of the founders initially had a role in the business, with Pettid

serving as the corporation's chief financial officer. Thomas and Brian "backed out" of the day-to-day operations of the corporation in 2019. Pettid, along with the corporation's general manager, subsequently took on most of the business responsibilities. At some point, Thomas and Brian were alerted that Pettid was extending corporate loans to himself, using company credit and debit cards to make personal purchases, and taking active steps to conceal those transactions. After an internal investigation, Pettid was terminated from his role at the corporation on December 9, 2021.

On April 25, 2024, the State filed a two-count amended information charging Pettid with the following crimes: count 1, theft by deception ($5,000 or more), in violation of Neb. Rev. Stat. § 28-512 (Reissue 2016), and count 2, unauthorized use of a financial transaction device ($5,000 or more), in violation of Neb. Rev. Stat. § 28-620 (Reissue 2016), both Class IIA felonies. Count 1 specifically alleged that between April 1, 2020, and December 31, 2021, Pettid obtained $139,817.87 from Medics at Home by deception. Pursuant to a plea agreement, Pettid pled no contest to count 1 of the amended information. The district court accepted Pettid's no contest plea, and the State dismissed the remaining charge. The matter was then set for a hearing to determine restitution.

## RESTITUTION HEARING

A restitution hearing was conducted on February 4, 2025. The State called Thomas to testify about the extent of Pettid's theft. According to Thomas, he was first alerted of financial irregularities in the corporation after finding a business check "addressed" to Pettid. When confronted about the check, Pettid admitted to executing two loans on behalf of the corporation to himself. Thomas testified that these loans were accounted for in the corporation's financial statements, but the other founders "never saw" those statements because they were "changed" by Pettid.

Pettid's confession prompted Thomas, Thomas' wife, and Brian to examine the corporation's bank records. Thomas stated that Medics at Home had a "regular checking account" and a "credit card account"; each founder had access to a company debit and credit card. The group went through the corporation's monthly bank statements "line by line" and created a spreadsheet that included all transactions that were "not business related." Any transactions that were related to the business or otherwise "questionable" were excluded from the spreadsheet. Based on his investigation, Thomas believed Pettid had stolen over $340,000 from Medics at Home. However, Thomas acknowledged that a large portion of Pettid's unauthorized purchases occurred outside the applicable statute of limitations. See Neb. Rev. Stat. § 29-110(1) (Reissue 2016) (default 3-year statute of limitations for felony offenses). Thomas agreed with the State that the amount stolen within the statute of limitations was $139,817.87. However, upon cross-examination by Pettid, Thomas conceded that figure was calculated by the State's investigators, and he had not personally gone through the business records to confirm the number's accuracy.

At the restitution hearing, the State also offered hundreds of pages of monthly bank statements from three separate accounts maintained by Medics at Home. These records included transactions spanning from April 2020 to December 2021. The records did not distinguish between legitimate and unauthorized transactions.

Pettid testified to his ability to pay restitution. At the time of the hearing, Pettid worked nights at Amazon, earning $800 a week. He owned a home in Gretna, Nebraska, where he lived with his wife and two of his minor children. Pettid indicated that he also had two college-aged children from a previous marriage that did not live with him. Pettid estimated that his home was worth around $360,000. He had a monthly mortgage payment of $1,710 and an outstanding principal balance of approximately $100,000.

According to Pettid, his real estate was subject to a $700,000 tax lien that arose during his tenure at the corporation. However, the State presented rebuttal evidence suggesting the tax lien had been resolved. Thomas testified that in 2015, Medics at Home made "some errors" in payroll taxes and voluntarily reported the issue to the Internal Revenue Service. Liens were subsequently filed against Thomas, Brian, and Pettid. Thomas indicated that Medics at Home had resolved the tax issue as of the time of his testimony.

Pettid testified that he spent between $800 and $1,000 per month on groceries for his family; $150 per month on fuel; $500 per month on healthcare costs; $60 per month on prescription medication; $270 per month for his family's phone and internet plan; $520 per month on payments for the family vehicle; $250 per month on utilities; and around $200 per month to support his older children from his previous marriage. Pettid also indicated that he had approximately $5,000 in outstanding medical bills and $5,000 in credit card debt.

### RESTITUTION ORDER

On March 11, 2025, the district court entered an order of restitution. The court found Thomas' testimony "regarding the process taken to substantiate the lost [sic] suffered by Medics at Home" "credible." It concluded the "evidence established that Medics at Home suffered a loss in excess of $340,000." The court noted that the State represented $139,817.87 as the amount stolen within the applicable statute of limitations. Although the court recognized that Thomas "did not recheck or review documentation relied upon by the State" before testifying about losses incurred within the statute of limitations, it nonetheless found that the corporation "suffered an actual loss of $139,817.87" during that timeframe.

The district court found that restitution was warranted and ordered Pettid to pay $139,817.87 to Medics at Home "within five years of the date of sentencing or five years upon release from incarceration, whichever is later."

### MOTION TO RECONSIDER

On June 2, 2025, Pettid filed a motion to reconsider. The motion alleged that (1) the district court did not give "meaningful weight" to Pettid's ability to pay restitution and (2) that there was insufficient evidence to support the court's calculation of the corporation's actual losses. As to his second point, Pettid argued that Thomas' testimony at the prior hearing provided "no basis" for the conclusion that the actual losses sustained by Medics at Home was $139,817.87.

At a hearing on Pettid's motion to reconsider, the district court received additional evidence. Most notably, the State offered, without objection, the original spreadsheet created by Thomas during his initial investigation. The document contained several itemized lists of unauthorized transactions dating as far back as 2015. We will discuss the contents of the spreadsheet further in our analysis.

On September 9, 2025, the district court issued an order affirming its previous order of restitution.

SENTENCING AND TERMS OF PROBATION

A sentencing hearing was held on October 1, 2025. The district court heard statements from the parties and Thomas. The court noted that it had reviewed the presentence report, considered the relevant statutory factors, and was "mindful of the impact" Pettid's actions had on the corporation. It concluded that "probation with upfront jail time would be beneficial to [Pettid]."

The district court ultimately sentenced Pettid to 60 months' probation. Among other conditions, Pettid was ordered to pay $139,817.87 in restitution within 60 months and to immediately serve 60 days in the Douglas County Jail. On that same day, the court entered a written order of probation specifying that restitution was to be paid in "equal monthly payments." The court entered an amended sentencing order on October 2, 2025, again reiterating that Pettid was to "pay restitution to Medics at Home c/o Thomas Townsend in the amount of $139,817.87 within 60 months as part of [p]robation."

Pettid appeals.

## ASSIGNMENTS OF ERROR

Pettid assigns that the district court (1) "committed plain error by failing to specify with care the precise terms of restitution payments." He also assigns that the court abused its discretion by (2) "finding actual damages in the amount of $139,817.87 when there was not sufficient evidence in the record," (3) "receiving evidence of damages related to a dismissed charge when determining restitution," and (4) finding he "had the ability to pay $139,817.87 in restitution."

## STANDARD OF REVIEW

Restitution ordered by a court pursuant to Neb. Rev. Stat. § 29-2280 (Reissue 2016), is a criminal penalty imposed as a punishment for a crime and is part of the criminal sentence imposed by the sentencing court. *State v. McCulley*, 305 Neb. 139, 939 N.W.2d 373 (2020). The rule that a sentence will not be disturbed on appeal absent an abuse of discretion is applied to the restitution portion of a criminal sentence, and the standard of review for restitution is the same as it is for other parts of the sentence. *Id.*

An abuse of discretion takes place when the sentencing court's reasons or rulings are clearly untenable and unfairly deprive a litigant of a substantial right and a just result. *Id.*

## ANALYSIS

On appeal, Pettid only challenges the portion of his sentence relating to restitution. Section 29-2280 vests trial courts with the authority to order restitution for actual damages sustained by the victim of a crime for which the defendant is convicted. *State v. McCulley, supra*. Neb. Rev. Stat. § 29-2281 (Cum. Supp. 2024), elaborates that before restitution can be properly ordered, the trial court must consider (1) whether restitution should be ordered, (2) the amount of actual damages sustained by the victim of a crime, and (3) the amount of restitution a criminal defendant is capable of paying. *State v. McCulley, supra*. With these principles in mind, we address Pettid's assignments of error.

In his first assignment of error, Pettid claims that the district court "committed plain error by failing to specify with care the precise terms of the restitution payments." Brief for appellant at 5. He argues the court's amended sentencing order fails to "specify a clearly defined timeline" and provide the "exact manner in which the restitution payment is to be made." *Id.* at 9.

Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *State v. Perry*, 318 Neb. 613, 17 N.W.3d 504 (2025). The certainty and precision prescribed for the criminal sentencing process applies to criminal sentences containing restitution ordered pursuant to § 29-2280. *State v. Street*, 306 Neb. 380, 945 N.W.2d 450 (2020). In imposing a sentence, the sentencing court should state with care the precise terms of the sentence to be imposed. *Id.* Section 29-2281(3) provides that a sentencing court "may order that restitution be made immediately, in specified installments, or within a specified period of time not to exceed five years after the date of judgment or [the] defendant's final release date from imprisonment, whichever is later." In *State v. Esch*, 290 Neb. 88, 858 N.W.2d 219 (2015), the Nebraska Supreme Court held that it is plain error for a sentence of restitution to fail to specify whether the restitution is to be made immediately, in specified installments, or within a specified period of time. The court explained that "although § 29-2281 offers options, one option must be ordered." *State v. Esch*, 290 Neb. at 97, 858 N.W.2d at 225.

In his brief, Pettid appears to argue that the district court's oral pronouncements at sentencing contradict the written amended sentencing order entered on October 2, 2025. Pettid points out that at the sentencing hearing, the court ordered him to serve 60 days in the Douglas County Jail. He argues that the amended sentencing order "make[s] no mention of the 60-day jail sentence," which "necessarily change[s] the timeline for the start of a probationary period." Brief for appellant at 10. Pettid claims that there is ambiguity as to whether the 60-month timeframe in which he is to pay restitution begins at sentencing or upon release from his 60-day jail term.

The district court's amended sentencing order provides that Pettid "shall pay restitution to Medics at Home c/o Thomas Townsend in the amount of $139,817.87 within 60 months as part of [p]robation." While Pettid is correct that the amended sentencing order makes no mention of his 60-day jail term, a separate order of probation entered on October 1, 2025, clearly identifies the jail term as a condition of probation. See Neb. Rev. Stat. § 29-2262(2)(b) (Reissue 2016) (court may, as condition of probation, require defendant "[t]o be confined periodically in the county jail . . . not to exceed the lesser of ninety days or the maximum jail term provided by law for the offense"). The probation order also states that Pettid is to pay restitution in "equal monthly payments." Since Pettid's 60-day jail term is a condition of probation and restitution payments are to be made "as part of [p]robation," the 60-month timeframe in which restitution is to be paid began at the time of sentencing. Pettid's 60-day jail term did not affect the start of his restitution obligation. We conclude that the court's amended sentencing order and its order of probation, taken together, clearly indicate that Pettid is to pay $139,817.87 within 60 months of sentencing, a specified timeframe that does not exceed 5 years, which complies with § 29-2281(3).

Pettid also argues that the amended sentencing order's language describing restitution "'as a part of probation'" "is not sufficiently precise to meet the standard in" § 29-2281 because "a

violation of probation would nullify the restitution obligation." Brief for appellant at 10. We fail to see how making the payment of restitution a condition of Pettid's probation constitutes plain error. Pettid is correct that the State can, under certain circumstances, file a motion or information to revoke a defendant's probation. See Neb. Rev. Stat. §§ 29-2267 and 29-2268 (Cum. Supp. 2024 and Supp. 2025). A sentencing court is also free to modify or eliminate the conditions of a defendant's probation on its own motion at any time. See Neb. Rev. Stat. § 29-2263(3) (Reissue 2016). However, § 29-2262(2)(r) expressly authorizes a court to require an offender "[t]o make restitution" as a condition of probation. The mere possibility that Pettid's probation conditions could be modified does not render the district court's sentence so indefinite as to constitute plain error. The amended sentencing order, when read in conjunction with the order of probation, complies with § 29-2281(3) and is sufficiently specific to apprise Pettid of the terms of his sentence. Accordingly, Pettid's first assignment of error fails.

AMOUNT OF ACTUAL LOSSES

Pettid next argues that the district court abused its discretion in determining the amount of restitution to be paid. He claims the evidence received by the court "does not support a factual finding that $139,817.87 is the amount of actual loss to Medics at Home." Brief for appellant at 11. Pettid particularly takes issue with the manner in which the State presented the corporation's losses. He notes that the State offered "hundreds of pages of bank records" that "contain no line by line audit of which transactions were business related and which are not." *Id.*

We agree with Pettid that the State could have done a better job of clearly delineating the amount of the actual losses that occurred within the statute of limitations. As Pettid correctly points out, the State offered voluminous bank records at the restitution hearing that in no way distinguished between legitimate business expenditures and Pettid's unauthorized purchases. However, the State does not bear a strict burden of proof with regard to restitution. *State v. Street, supra*. In reviewing restitution as part of the sentence in a criminal case, the question is whether there is competent evidence in the record, as opposed to mere guess or conjecture, which reasonably supports the court's calculation of the amount of the victim's loss. *Id.* Restitution will be upheld if calculated by use of reasonable methods; therefore, when the defendant does not present contradictory evidence, the court does not err in relying on a victim's competent estimates of loss. *Id.*

At the restitution hearing, Thomas indicated that he, along with two other individuals, conducted a line-by-line review of the business' monthly bank statements. The group generated a spreadsheet that included transactions that were not business related. Transactions that were legitimate or otherwise deemed "questionable" were excluded from the spreadsheet. Thomas testified that Pettid had stolen over $340,000 from the corporation based on his investigation. However, by the time criminal charges were filed against Pettid, many of the unauthorized purchases had occurred outside the applicable statute of limitations. Count 1 of the amended information, to which Pettid pled no contest, alleged that the unauthorized transactions occurring within the statute of limitations took place between April 1, 2020, and December 31, 2021. During his testimony, Thomas agreed with the State that the amount stolen by Pettid between these dates was $139,817.87. However, Thomas explained that this amount was calculated by the State's investigators, and he conceded that he never personally confirmed the amount was accurate.

- 6 -

Although it is unclear how the State's investigators calculated the $139,817.87 figure adopted by the district court, the evidence in the record easily supports such a finding. Notably, at the hearing on Pettid's motion to reconsider, the State offered, without objection, the spreadsheet (exhibit 14) Thomas created during his investigation that listed all expenses made by Pettid determined to have "no legitimate business purpose." Based on our review of the spreadsheet, between April 1, 2020, and December 31, 2021, Pettid received a total of $33,249.96 in "Paycheck Reimbursements"; used the "Union Bank Debit Card" to make a total of $55,702.02 in purchases; and used the "Northwest Bank Credit Card" to make $29,562.69 in purchases. A review of the bank records offered by the State at the restitution hearing also shows 12 checks tied to a commercial analysis account maintained at Northwest Bank made payable to "R & J Holding[s]." Thomas testified at the restitution hearing that R&J Holdings was a company Pettid formed with an unrelated partner to "purchase [a] lake house." Thomas indicated that Medics at Home had no contracts or other business dealings with R&J Holdings. These checks totaled $22,500.

When added together, the above figures total $141,014.67. Therefore, to the extent that the district court erred in calculating the corporation's actual losses, Pettid was not prejudiced. There is sufficient evidence in the record to support the court's order of restitution in the amount of $139,817.87. Accordingly, we find no abuse of discretion by the court.

IMPROPER EVIDENCE

Pettid next claims that the district court improperly "receiv[ed] evidence of damages related to a dismissed charge when determining restitution." Brief for appellant at 6. He argues that the court's calculation of restitution was largely based upon "unauthorized expenditures on three separate credit and debit cards as well as some payroll disbursements." *Id.* at 12. Pettid contends those transactions are only relevant to count 2 of the amended information, which was voluntarily dismissed by the State pursuant to the plea agreement.

At the outset, we do note that § 29-2280 permits a court, "[w]ith the consent of the parties," to "order restitution for the actual physical injury or property damage or loss sustained by the victim of an uncharged offense or an offense dismissed pursuant to plea negotiations." The State's amended information charged Pettid with two offenses: count 1, theft by deception ($5,000 or more), and count 2, unauthorized use of a financial transaction device ($5,000 or more). Pursuant to a plea agreement, Pettid pled no contest to count 1, and the State dismissed count 2. We find no indication in the record that Pettid consented to pay restitution in relation to count 2.

Pettid argues that the criminal acts alleged under count 1 of the amended information "refer to loans [he] made to himself using company funds," not the use of corporate credit and debit cards. Brief for appellant at 13. To support this contention, he points to language in the factual basis offered by the State at the plea hearing that specifically references these unauthorized loans. The State's factual basis did contain averments that Pettid "took out loans from the company" "which were later paid back." Pettid contends that since he "repaid Medics at Home for the personal loans," no restitution remedy is available for count 1. *Id.*

We disagree with Pettid's interpretation of the State's factual basis. At the plea hearing, the State also referred to Pettid's unauthorized use of "company credit cards" and his "access to other company bank accounts" in its factual basis. The State likewise noted that Pettid "took active

- 7 -

steps to cover up [h]is theft" by "doing what he could to impede or deny access to the financial records of the other company partners."

Section 28-512, under which Pettid was convicted, provides:

A person commits theft if he obtains property of another by deception. A person deceives if he intentionally:

(1) Creates or reinforces a false impression, including false impressions as to law, value, intention, or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise; or

(2) Prevents another from acquiring information which would affect his judgment of a transaction; or

(3) Fails to correct a false impression which the deceiver previously created or reinforced, or which the deceiver knows to be influencing another to whom he stands in a fiduciary or confidential relationship; or

(4) *Uses a credit card*, charge plate, *or any other instrument which purports to evidence an undertaking to pay for property or services delivered or rendered to or upon the order of a designated person or bearer* (a) where such instrument has been stolen, forged, revoked, or canceled, *or where for any other reason its use by the actor is unauthorized*, or (b) where the actor does not have the intention and ability to meet all obligations to the issuer arising out of his use of the instrument.

The word deceive does not include falsity as to matters having no pecuniary significance, or statements unlikely to deceive ordinary persons in the group addressed.

(Emphasis supplied). While Pettid is correct that the unauthorized use of corporate debit and credit cards would undoubtably constitute the offense of unauthorized use of a financial transaction device, see § 28-620(1)(d) (making it unlawful to use financial transaction device "[w]hen for any reason his or her use of the financial transaction device is unauthorized either by the issuer or by the account holder"), the statutory language found in § 28-512(4)(a) is broad enough to include his unauthorized use of the corporation's banking cards. Accordingly, the district court did not abuse its discretion in considering Pettid's unauthorized use of corporate credit and debit cards when calculating restitution to be paid as to count 1.

PETTID'S ABILITY TO PAY

Pettid lastly argues that the district court abused its discretion by finding that he had the ability to pay $139,817.87 in restitution. He contends that "[i]f he were to satisfy the restitution obligation completely, he would be making payments of $2,330.28 per month." Brief for appellant at 14.

Based on his testimony at the restitution hearing, Pettid's monthly expenses are approximately $4,660. He also has approximately $5,000 in outstanding medical bills and $5,000 in credit card debt. Pettid indicated that he is employed at Amazon where he earns around $800 per week. The evidence also showed that Pettid has roughly $260,000 in home equity, but he indicated that his home was subject to a $700,000 tax lien. However, the State introduced rebuttal evidence suggesting the tax lien no longer existed.

While we acknowledge the difficulty Pettid may have in satisfying his restitution obligation, the Nebraska Supreme Court has explained that a criminal defendant's "ability to pay is not a necessary prerequisite to an order of restitution for actual damages sustained by the victim of a crime for which the defendant is convicted." *State v. Street*, 306 Neb. 380, 393-94, 945 N.W.2d 450, 461 (2020). Section 29-2281 mandates that a court "shall consider the defendant's earning ability, employment status, financial resources, and family or other legal obligations," as well as the defendant's "obligation to the victim," balancing one set of circumstances against the other. Thus, under § 29-2281, a defendant's ability to pay is a consideration that the sentencing court must weigh against the defendant's obligations to the victim for the crime or crimes committed; it is neither exclusive of other factors nor controlling of the discretion of the court. See *State v. Street, supra*.

Here, the district court stated in its March 11, 2025, restitution order that it had "considered [Pettid]'s earning ability, employment status, financial resources, and family or other legal obligations and balanced such considerations against the actual loss sustained by Medics at Home." It concluded that Pettid "has the financial resources at this time to pay the restitution in this matter." The court expressly considered the statutory factors outlined in § 29-2281 and determined that the substantial losses to Medics at Home warranted an order of restitution. We cannot say the district court abused its discretion in reaching that conclusion.

We also note that Neb. Rev. Stat. § 29-2285 (Reissue 2016), allows a defendant to "petition the sentencing court to adjust or otherwise waive payment or performance of any ordered restitution or any unpaid or unperformed portion thereof." If Pettid does struggle to meet his restitution obligation, he has a statutory remedy available to him. Further, under Neb. Rev. Stat. § 29-2284 (Reissue 2016), a defendant's probation cannot be revoked for failure to pay restitution "unless noncompliance with the restitution order is attributable to an intentional refusal to obey the order or a failure to make a good faith effort to comply with the order." Thus, the statutory scheme governing orders of restitution provides safeguards for defendants who are unable, despite good-faith efforts, to satisfy their restitution obligations.

## CONCLUSION

For the foregoing reasons, we affirm the portion of the district court's October 2, 2025, amended sentencing order requiring Pettid to pay $139,817.87 in restitution over the term of his 60 months' probation.

AFFIRMED.